*AGS Copy* 7/23/04 T/S

FILED
JUN 2 9 2004
CLERK
ALA COURT CRIMINAL APPEALS

IN THE COURT OF CRIMINAL APPEALS

STATE OF ALABAMA

FILED
JUL 0 2 2004
CLERK
ALA COURT CRIMINAL APPEALS

NO. CR-03-1173

TERRY LIGON,
APPELLANT,

VS.

THE STATE OF ALABAMA,
APPELLEE.

APPEAL FROM THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA.
(CASE NOS. CC-01-352.60-356.60)

BRIEF OF APPELLANT

TERRY LIGON, pro-se
#220217
VENTRESS CORRECTIONAL FACILITY
P.O. BOX 767
CLAYTON, AL. 36016-0767


EXHIBIT
1E

STATEMENT REGARDING ORAL ARGUMENT

APPELLANT DOES NOT REQUEST ORAL ARGUMENT.

TABLE OF CONTENTS

page

STATEMENT REGARDING ORAL ARGUMENT............................i

TABLE OF CONTENTS...........................................ii

TABLE OF AUTHORITIES.......................................iii

STATEMENT OF THE CASE......................................1-3

STATEMENT OF THE ISSUES.....................................3

STATEMENT OF THE FACTS....................................4-5

STATEMENT OF STANDARD OF REVIEW...........................6-7

SUMMARY OF ARGUMENT.......................................8-9

ARGUMENT................................................10-18

CONCLUSION.................................................18

CERTIFICATE OF SERVICE.....................................19

## TABLE OF AUTHORITIES

page

BRADY v. UNITED STATES, 397 U.S. 742----------------------------------------- 12

CAVE v. SINGLETARY,    971 F. 2d. 1513 (11th Cir. 1992)--------------------- 7

Ex parte BOATWRIGHT,   471 So. 2d. 1257 (Ala. 1985)------------------------ 11

Ex parte LAWLEY,       512 So. 2d. 1372 (Ala.1990)------------------------- 15

JEFFERSON v. STATE,    643 So.2d. 313 (Ala. Cr. App. 1994)--------------- 14

JOHNSON v. STATE,      835 So. 2d. 1077 (Ala. Cr. App. 2001)------------- 11

MARTIN v. MAGGIO,      711 F. 2d. 1273 (5th Cir. 1983)--------------------- 9

McMANN v. RICHARDSON,  397 U.S. 759 (1970)-------------------------------- 12

RUMPEL v. STATE,       847 So. 2d. 399 (Ala. Cr. App. 2000)-------------- 12

SAYLOR v. STATE,       719 So. 2d. 266 (Ala. Cr. App. 1998)-------------- 15

STRICKLAND V. WASHINGTON, 466 U.S. 668 (1984)------------------------------passim

UNITED STATES v. RUIZ, 536 U.S. 622 (2002)-------------------------------- 9

WIGGINS v. SMITH,      ____U.S.____, 123 S. Ct. 2527--------------------- 7,15

WRIGHT v. STATE,       845 So. 2d. 836 (Ala. Cr. App. 2001) ------------- 12

## OTHER REFERENCES

ALABAMA DRIVER'S MANUAL (revised 1997)------------------------------------- 14

ALABAMA RULES CRIMINAL PROCEDURE,----------------------------------------- 10,11
     Rule 32.3; Rule 32.7
AMERICAN BAR ASSOCIATION, CRIMINAL JUSTICE STANDARD,--------------------- 14
     Rule 4-4.1; Rule 4-6.1
ALABAMA RULES OF PROFESSIONAL CONDUCT,----------------------------------- 8,17
     Rule 3.3(a)(3); Rule 3.8(1)(a); Rule 4,6 & Rule 8.4

<u>STATEMENT OF THE CASE</u>

This is an appeal by Terry Ligon, hereafter referred to as Ligon, of the dismissal of his A.R.Cr.P., Rule 32 petition for post-conviction relief of his convictions and sentence for Murder (1 count) and Assault 1st degree (4 counts), in the Circuit Court of Russell County, Alabama, with Judge George R. Greene presiding.

On September 10, 2001, Ligon pled guilty to the above offenses as charged in the indictments. ( R. 127-142 ) On November 13, 2001, the Honorable George R. Greene sentenced Ligon to serve twenty-five years in the State Penitentiary of Alabama for his Convictions.

Upon acceptance of the plea Ligon waived his rights to appeal or file any post-conviction petition or remedy including, but not limited to the filing of a Rule 32 petition, a motion to set aside his plea of guilty, or any sentence that may be imposed, or appeal any conviction that results from these cases. ( R. 140 )

On October 30, 2002, Ligon sent a Rule 32 petition to the Circuit Court of Russell County, challenging his convictions and sentence. (R.16-23) Ligon also sent an Affidavit of Substantial Hardship,(R.11) a in forma pauperis declaration, (R.13) and "Issues and Law Pertaining To Rule 32 Petition" with exhibits attached marked "A" thru "D". (R.24-56)

On March 30, 2004, after filing a Petition For A Writ Of Mandamus with this Honorable Court to require the lower court to respond to Ligon's Rule 32 petition, the trial court basically summarily dismissed Ligon's petition that this appeal ensues. ( R. 125-126, 149)

Ligon respectfully submits the following facts and exhibits that would confirm that there has been much confusion gererated in the filing of this petition, more likely due to the fact that there also was a civil suit filed

-in the Circuit Court of Russell County at the same time Ligon initiated

his petition, by the parties that there were involved in the accident that

forms the bases for Ligon's criminal convictions. ( See: exhibit #1 attached)

<u>PROCEDURAL FACTS</u>

(a) On April 11, and 12th 2002, Ligon motioned the trial court for a

"free transcript" of the plea and sentencing hearings, the motion is stamped

as filed by the clerk as dated April 13, 2002. (See: exhibit #2 attached) The

Case Action Summary (R.1-10) does not reflect this motion, nor does it show

if it was denied or granted.

(b) Ligon never received any ("memo") or ("Order") from the trial court

on December 4, 2002, stating that "the clerk should not accept the Rule 32

petition for filing until petitioner pays the court costs (sic) or the court

rules on his Affidavit of Substantial Hardship." (R. 58) What Ligon did

receive from the clek's office was his single copy of the Rule 32 petition,

his in forma pauperis declaration, marked filed on October 31, 2002, (R.13-58)

and a "highlighted" instruction regarding the Rule 32 filing, to send 3

copies to the court, and his Affidavit of Substatal Hardship. (R.11-12),

clearly shows that document as motioning for an appointment of an attorney,

which was denied on 12/02/02. (R. 12)

(c) )n December 19, 2002, Ligon sent to the court 3 copies of his Rule

32 petition as instructed, and his in forma pauperis declaration, plus a

letter explaining why he was unable to do such on October 30, 2002. (R.60)

(d) The record on appeal does not show that the trial court Ordered the

district attorney's office to answer to the Rule 32 petition, however, on

that office did file a response on January 9, 2003, <u>which Ligon never did</u>

<u>receive</u>, yet there is a "Certificate of Service" attached to the answer that

states that it was mailed to him. (R. 121-122) The Case Action Summary has

this document as filed on March 12, 2003, and does not show a filing date

(2)

-stamped on it, <u>ALMOST</u> ! If one looks closely it can be adjudged that a previous filing date was "whited-out", Ligon never saw this document until he received the Trial Clerk's Record on Appeal, May 11, 2004.

(e) The record on appeal does show that Ligon motioned the trial court again for an appointment of counsel on November 5, 2003, but does not show if said motion was denied or granted. (R. 123)

Ligon respectfully avers that the foregoing illustrate a very confusing procedural history, especially in terms used by the lower court and the omission of filings and orders of the court allbeit if there were any in certain instances and these facts do show he was denied due process, to the point that one might think there was a conspiacy to thwart the filing of his Rule 32 petition.

<u>ISSUES PRESENTED FOR REVIEW</u>

I.)
<u>THE TRIAL COURT ERRED BY SUMMARILY DISMISSING APPELLANT"S RULE 32 PETITION WITHOUT ALLOWING HIM THE OPPORTUNITY, HE IS ENTITLED, TO PRESENT EVIDENCE TO SATISFY BURDEN OF PROOF?</u>

II.)  <u>APPELLANT'S COUNSEL WAS INEFFECTIVE IN HIS ASSISTANCE AND REPRESENTATION AS DELINEATED BY STRICKLAND v. WASHINGTON, 466 U.S. 668 (1984), THEREBY MAKING APPELLANT'S PLEA OF GUILTY NOT KNOWINGLY, INTELLIGENTLY OR VOLUNTARILY RENDERED.</u>

III.)  <u>THE TRIAL COURT WAS WITHOUT AUTHORITY TO ACCEPT APPELLANT'S PLEA OF GUILTY WHEN THE STATE AND APPELLANT'S COUNSEL DID MISREPRESENT MATERIAL FACTS TO THE COURT AT THE PLEA OF GUILTY HEARING, THEREBY MAKING APPELLANT'S PLEA NOT ONE KNOWINGLY, INTELLIGENTLY OR VOLUNTARILY RENDERED.</u>

Ligon would request that this Honorable Court consider this Brief on appeal in the most liberal of terms as to form and content as he is not formally trained in the legal profession, and not familiar with the rules and procedural aspects of the judicial process.

(3)

STATEMENT OF THE FACTS

On March 25, 2001, Ligon was involved in an automobile accident, in which he ran into the back on another vehicle making a left-hand turn. (R.50-52) There were 5 people in this vehicle, a 10 month-old child, who was pronounced dead at the scene of the accident, and 3 adults and another child of 3 years of age, who were transported to the emergency room for examination. Ligon's blood/alcohol test showed 0.16, sufficient to charge him with Driving While Under The Influence. Ligon was arrested and later indicted for Murder (reckless) (1 count) and for Assault 1st degree (4 counts). (R. 128-130) May this Honorable Court take judicial notice that the colloquy for the indictment on case number CC-01 0356, charging Ligon with reckless murder, states that he was also "in violation of Section 13A-5-191," Ligon avers that there is no such statute. (R.30-31, 55-56, 128-130)

On September 10, 2001, upon the advice of appointed counsel Ligon pled guilty to the above offenses as charged in the indictments. (R. 137-140) (See also: exhibit 2-A attached). Prior to the trial court accepting Ligon's plea, the court asked the district attorney if the other 4 occupants of the car "sustained any serious physical injury"? The district attorney and defense counsel both affirmed to the court that they did.(R. 135-137) These statements by the district attorney and counsel for Ligon satisfied the court to accept Ligon's plea as "serious physical injury" is an essential element to the offense of Assault 1st degree.

On November 11, 2001, Ligon was sentenced to serve 25 years in the state penitentiary. On April 11, and 19th, 2002, Ligon wrote to his attorney asking that he be given his case file, (R. 53-54), after he learned from relatives none of the 4 occupants sustained "real injuries" that would warrant what he told by his attorney. When he did receive the case file, he now read the police reports showing discrepencies as to the injuries received and also that the

(4)

-diagram showing the positions of the vehicles after the accident does not reflect a true depiction of the scene where both vehicles landed after the accident. (R. 50-52, 111-119,)(See also: exhibit #4 attached). On January 7, 2003, depositions by the 3 adult occupants of the other vehicle gave sworn testimony during a hearing for the matter of a civil suit against Ligon; Saturn Motor Co.; and Evenflo Co. ( child restraint seat manufacturer), wherein it was shown that none of the four occupants sustained "serious physical injury" to warrant a charge to the offense of Assault 1st degree, and that the 3 year-old child occupant did not sustain any physical injury at all. (See: exhibits #6-8 attached). The documents received from his court appointed attorney and the facts listed above gave reason for Ligon to file a Rule 32 petition for post-conviction relief basically because he was not appraised of the documents or the elements of the offenses for which his attorney never explained to him, and had he known these facts he would not have elected to plead guilty, but rather go to trial, for as the statement to the police by Taquanda Law says she was making a left-hand turn on Highway 165. Ligon avers that Highway 165 is a major thoroughfare with a speed limit of 55 mph, it is a four lane highway, with 2 lanes heading South and 2 lanes heading North, with a solid double yellow line separating the two directions, and unless the law has changed one cannot cross a solid double yellow line, it is prohibited. Counsel for Ligon had these documents and he never explained nor did he show them to Ligon, only stating that he was in a lot of trouble and the best thing for him to do was to plead guilty. Ligon is currently incarcerated in the Alabama Correctional System, at Ventress Correctional Facility.

<u>STATEMENT OF STANDARD OF REVIEW</u>

<u>THERE WAS INEFFECTIVE ASSISTANCE OF COUNSEL</u>
<u>AS DELINEATED BY STRICKLAND v. WASHINGTON,</u>
<u>466 U.S. 668, 104 S.Ct.2052,80 L. Ed.674.</u>

A.) <u>Standard of Review</u>:

   In <u>Strickland v. Washington</u>, 466 U.S. 668, the Supreme

Court delineated the proper scope of review in examining a claim of ineffective

assistance of counsel:

> " A convicted felon making a claim of ineffective
> assistance of counsel must identify the act or
> omissions that are alleged not to have the result
> of reasonable judgment. the court must then
> determine whether in light of all the circumstances
> the identified acts were outside the wide range
> of professionally competent assistance. In making
> that determination, the court should keep in mind
> that counsel's function, as elaborated in prevailing
> professional norms, as to make the adversarial
> testing process work in the particular case...and
> make all significant decisions in the exercise of
> reasonable professional judgment."

<u>Id.</u> at 690.

   The United States Court of Appeals for the Eleventh

Circuit interprets <u>Strickland</u> as meaning that in evaluating counsel's

performance:

> " The court must...determine whether, in light of
> all the circumstances, the identified acts or
> omissions were outside the wide range of professionally
> competent assistance. In making that determination
> the court should keep in mind that counsel's function
> as elaborated in prevailing professional norms, is to
> make the adversarial testing process work in the
> particular case." <u>Smith v. Wainwright</u>, 777 F. 2d 609,
> 616,(11th Cir. 1985) (Citing <u>Strickland,</u> 466 U.S.@ 690.)

   <u>Strickland</u> , calls for a two-part test:

> " <u>First</u>, the defendant must show that counsel's
> performance was deficient. This requires showing
> that counsel made errors so serious that counsel
> was not functioning as the counsel guaranteed the
> defendant by the Sixth Amendment.
> <u>Second</u>, the defendant must show that the deficient
> performance prejudiced the defense. This requires

(6)

> -showing that counsel's errors were so
> serious as to deprive defendant of a
> fair trial, a trial whose result is
> reliable."

Id. at 687.

In a more recent case on ineffective assistance of counsel the U.S.

Supreme Court held in Wiggins v. Smith, _____U.S._____, 123 S.Ct. 2527,

156 L.Ed. 2d. 473, (2003) that:

> "The court merely assumes that the strategy
> is reasonable, but must conduct an assessment
> of whether the strategy is reasonable
> professional conduct."

It is Ligon"s contention that his counsel's decisions and professional

conduct must be reviewed in the context of reasonableness based upon the

particular facts of this case and must be measured based upon the reasonable-

-ness of his actions and whether or not the strategic choices made were

informed choices. For as stated in Cave v. Singletary, 971 F. 2d. 1513, 1518

( iith Cir. 1992):

> "The mere incantation of the word 'Strategic'
> does not insulate attorney behavior from review.
> The attorney's choice of tactics must be
> reasonable under the circumstances."

(7)

SUMMARY OF ARGUMENT

Ligon avers that in the petition for post-conviction relief he did present enough facts to warrant an evidentiary hearing at the minimum to ascertain that his counsel rendered ineffective assistance, this was the premise of most of Ligon's claims, because his plea of guilty could not have been rendered knowingly, intelligently and/or voluntarily entered by counsel's actions and omissions as delineated in Strickland v. Washington, 466 U.S. 668, (1984). Yet the trial court summarily dismissing his petition did not address any of these claims. (R. 29-34, 42-43, 45-49, 125-126)

Further, Ligon argues that the lack of proper notice to certain filings, pleadings, and responses by the trial court and the district attorney's office effectively foreclosed any opportunity he was entitled, to present further evidence to satisfy his burden of proof to the court. Ligon avers that the lower court erred in doing such procedurally. Rule 32.3; Rule 32.7 (a); and Rule 32.7(d). Ligon never received proper notice that he must pay the court costs,(sic) but rather that he must pay the filing fees, or until the court rules on his in forma pauperis declaration, and not his Affidavit of Substantial Hardship. The district attorney never sent his answer to Ligon on January 9, 2003, as stated in the Certificate of Service.

Ligon argues that the misrepresentations of his counsel and the district attorney of material facts to the trial court during the plea hearing amount to fraud, deceit, professional misconduct and a violation of his right to have an attorney representing him that would render effective assistance. Ligon would show that the claim of misrepresentations of material facts to the trial court do mandate that a evidentiary hearing be held, because they were done with reckless disregard for the truth, knowingly, and intentionally, violating his rights to a fair proceeding and in violation of Rules of Professional Conduct. (See: Rule 3.3(a)(3); Rule 3.8(1)(a); Rule 4.6 and Rule 8.4.

...ther, in <u>Martin v. Maggio</u>, 711 F. 2d. 1273, 1289 (5th Cir. 1983)

tha... ...rt stated the following concerning ineffective assistance of

cou...

> "If our review of the record convinced
> us that counsel had relied on unreasonable
> assumptions or strategies in deciding not
> to pursue a defense, a finding of
> ineffective assistance would be warranted."

... the instant case the failure of counsel to challenge offered proof

of ... ...ssential element of the crimes for which Ligon pled guilty to, was

not ...asonable and more so counsel's own testimony at the plea hearing

pre...diced Ligon, violating his constitutional right to have an effective,

loy... attorney. In <u>United States v. Ruiz</u>, 536 U.S. 622, 122 S.Ct. 2450, 153

L.Ed. 2d. 586 (2002) the Court stated:

> " The right to effective assistance of
> counsel makes plain that an attorney's
> role would be to challenge the charge
> or the sentence."

<u>Id</u>. at 629.

Ligon is due to have his plea of guilty to the indictments vacated and

a new trial ordered.

ARGUMENT

I.)

THE TRIAL COURT ERRED BY SUMMARILY
DISMISSING APPELLANT'S RULE 32
PETITION, FORECLOSING AN OPPORTUNITY
TO PRESENT EVIDENCE TO SATISFY HIS
BURDEN OF PROOF. RULE 32.3 & 32.7(a).

March 30, 2004, the trial court summarily dismissed Ligon's Rule 32
petition for post-conviction relief in answer to an Order from this Honorable
Court, pursuant to Ligon filing for a Petition For A Writ of Mandamus to have
the lower court respond to his petition. (R. 125-126) Ligon's petition lingered
in the lower court after being marked filed on October 31, 2002. (R. 13-24)

In the trial court's Order dismissing the Rule 32, the court stated among
other reasons for denial that: "Any newly discovered evidence that Petitioner
sets forth would not change or likely change the determination of guilt of
the Petitioner." (R. 125-126) This statement semi-coincides with the district
attorney's "Answer To Rule 32 Petition", wherein it is stated that: "Petitiner
has failed to state any new facts that would require a new trial be granted
and as such his 3rd ground for relief also is to be dismissed." (R. 121-122)
It must be noted at this point that Ligon never received a copy of the "Answer"
to his petition, although the Certificate of Service attached states that it
was sent to him on January 9, 2003, (R. 122) and the Case Action Summary,(R.
01-10) has the district attorney's "Answer" as filed on March 12, 2003, and
Ligon never received a copy of it at that time either, which denied Ligon an
opportunity to respond, accordingly as set forth in Rule 32.3, and that the
district attorney did not follow the procedure of Rule 32.7(a) wherein it
states in part the following:

> "...the district attorney shall file with
> the court and send to to the petitioner
> or counsel for the petitioner, if any, a
> response..."

Ligon would counter that the evidence not only submitted with the petition
on October 31, 2002, (R. 50-56) but also the evidence (exihbits) attached to

—to this brief (See exibits #6-8) would certainly contradict the statements of the trial court and the district attorney's office as to the determination of guilt and to what degree.

Ligon avers that this omission of not following the <u>Alabama Rules of Criminal Procedure</u>, did in fact leave Ligon unaware that the prosecutor filed (sic) a answer , whereby Ligon would have had the opportunity he was entited, to present evidence in order to satisfy fis burden of proof. Ligon was denied procedural due process by the actions of the prosecutor and the trial court and is due to have an evidentiary hearing on this issue. For as stated by this Honorable Court in <u>Johnson v. State</u>, 835 So.2d.1077, 1079-1780, that

> " A claim may not be summarily dismissed because
> the petitioner failed to meet his burden of
> proof at the initial pleading stage, a stage
> at which the petitioner has only a burden to
> plead."

and further in <u>Ex parte Boatwright</u>, 471 So. 2d. 1257, 1258 (Ala.1985) the Court stated

> "Further, when a petition contains matters
> which if true, would entitle the petitioner
> to relief an evidentiary hearing must be held."

Ligon avers that he has demonstrated in the Rule 32 petition by his statements affidavits and exhibits that his counsel has shown a pattern of ineffective assistance in representing Ligon. (R. 29-34, 42-43, 45-51, and 111-119) and the trial court erred by not addressing these claims and facts, and that by the precedural irregularities presented above have prevented Ligon from producing stronger evidence to satisfy his burden of proof for as Rule 32.3 clearly states:

> " The state shall have the burden of pleading
> any ground of preclusion, but once a ground
> of preclusion has been pleaded <u>the petitioner
> shall have the burden of disproving its
> existance by the preponderance of the evidence.</u>"
> (emphasis Appellant's)

The tone in the <u>Alabama Rules of Criminal Procedure</u> is of a mandatory nature and the trial court erred in dismissing Ligon's Rule 32 petition.

Had Ligon been allowed to rebut the district attorney's "Answer To Rule 32 Petition" there was a reasonable probability that the trial court would have granted an evidentiary hearing on counsel's ineffectiveness, because the facts and exhibits would show that counsel misrepresented material facts, not only to Ligon, but to the trial Court also, during the plea hearing, and therefore Ligon's plea of guilty must be vacated and a new trial ordered, or at the minimum an evidentiary hearing Ordered.

II.)                        ARGUMENT

> APPELLANT'S COUNSEL WAS INEFFECTIVE IN HIS
> ASSISTANCE AND REPRESENTATION AS DELINEATED
> BY STRICKLAND V. WASHINGTON, 466 U.S. 668
> (1984), THEREBY MAKING APPELLANT'S PLEA OF
> GUILTY NOT KNOWINGLY, INTELLIGENTLY OR
> VOLUNTARILY RENDERED.

It is Ligon's contention that he clearly has a right to challenge the ineffectiveness of his counsel, especially if counsel's decisions, advice and representation " fall below the objective standard of reasonableness," and that he cannot be precluded from review of this issue as he did not waive his rights relating to representation by an attorney as the "Explanation of Rights and Plea of Guilty" form shows. Ligon signed the form on September 10, 2001. (R. 44-49) (See; also exhibit #2-A attached) This honorable Court opined in Rumpel v. State, 847 So. 2d. 399 (2002) that:

> "The appellant could not be precluded on
> a Rule 32 petition raising ineffective
> assistance of counsel pertaining to the
> voluntariness of his plea of guilty."

See: also Wright v. State, 845 So.2d. 836 (Ala.Cr. App.2001)

Furthermore, plea barganing is Constitutional, Brady v. United States, 397 U.S. 742, 749-55 (1970), and counsel must be effective during the plea agreement stage, completely and fully advising his client. McMann v. Richardson, 397 U.S. 759, 770-771 (1970)

(12)

Ligon contends that his plea of guilty to the aforementioned indictments must be ___ed because of his counsel's ineffective assistance by not advising and expla___ all the facts of the charges and the prosecutor's evidence to him as he mi___ esented material facts conceming the injuries of the passengers and never ad___ ___ in "making the adversarial testing process work", but rather, wanted to ___ead the case out quickly. (See: exhibit #3 and 4 attached.) also (R. 44-4_)

From ___ onset of counsel's representation he demonstrates a pattern of not advoc___ing for Ligon by not challenging the indictment for Murder in Case Number CC-__-0356, whereas , it states that Ligon was in violation of Section 13A-5-19_. ode of Alabama, Ligon avers that <u>there is no such statute</u> and even the trial ___urt was not appraised of this error during the colloquy at the plea hearing. (R. 7-8, 55-56,and 130) Ligon would aver that this erroneous statute may not ___ ___atal, but it does demonstrate a willingness on counsel's part to let errors or evidence from the prosecutor's office upon which they would rely on to try Ligon if he went to trial, to go unchallenged, especially other documents that were ___art of the discovery from the district attorney's office. One of the documents ___ the statement of Taquanda Law to the Phenix City Police Department, she was the driver of the vehicle Ligon ran into. (R.50-52) in it she states that: "she jumped out of the vehicle...and ran to the back passenger door..." and further, "my sister and I followed...and EMT Johnny, made a cruel statement towards my sister...He stated that she was faking..." These staements give rise to a question of whether Lawanda and/or Taquanda Law suffered "serious physical injury," a essential element of Assault 1st degree? Earler in that same statement Taquanda Law says that " <u>I turned my signal light on to make a left-hand turn on 47A Highway 165 (That's the address)</u>". Ligon avers that Highway 165 is a major thoroughfare with 4 lanes, 2 lanes heading south and two lanes heading north,

—with a solid double yellow line separating both direction and the speed limit is 55 mph. Taquanda Law was making an illegal left-hand turn to get to the other side of Highway 165 by crossing over the solid double lines. (See: State of Alabama's Driver Manual, wherein it states: "crossing over solid double lines is prohibited".) Ligon avers that these statements and facts would certainly make counsel want to investigate further, and to challenge the contentions of the prosecutor as to the offenses. Counsel did not "make the adversarial testing process work in this case". The above facts do present a favorable position for Ligon had he gone to trial, and while not being totally exonerated, he very possibly could have received a lesser included offense verdict, or perhaps he would have been found innocent! For it has been opined by this Honorable Court in Jefferson v. State, 643 So.2d. 313, 315-317 (1994) that:

> "The existence of any small piece of
> evidence favorable to the defense may
> in a particular case, create just the
> doubt that prevents the jury from
> returning a verdict of guilty."

What is important in this case is that Ligon did not know the above until he received the case file from counsel after requesting it, had he known of these facts he would have elected to go to trial. Obviously, counsel did not investigate and if he did he did not advocate in a reasonable manner in accordance with the best interest of his client. Rather than argue the evidence either by not making any investigation or by ignorance, counsel urged Ligon to plead guilty and in doing such contradicts what the American Bar Association's Criminal Justice Standard 4-6.1 states about counsel effectiveness:

> "Under no circumstances should a lawyer
> recommend to a defendant acceptance of a
> plea unless a full investigation and
> study of the case has been conducted."

and further:

> "The duty to investigate exists regardless
> of the accused's admissions or statements
> to the lawyer or facts constituting guilt
> or the accused stated desire to plead guilty"
> ABA'S Criminal Justice Standard 4-4.1

(14)

"The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct, instead have emphasized the proper measure of attorney performance remains still reasonableness under prevailing professional norms," Wiggins v. Smith. 539 U.S. 123 S.Ct. 2527, 2535, 156 L.Ed.2d. 471 (2003); quoting Strickland, 466 U.S. at 68. In this case counsel's performance "fell below an objective standard of reasonableness". Strickland at 688 and Ligon's defense was prejudiced by this failure to "make the adversarial testing process work in this particular case." Id. @ 690

The State would argue that counsel's actions, not to challenge the evidence, but rather pursue a favorable plea agreement, was a "strategic decision" as the Alabama Supreme Court has oppined in Ex parte Lawley, 512 So 2d. 1372 that:

> "Strategic choices made after a thorough
> investigation of relevant law and facts
> are virtually unchallengeable."

Ligon would conter with a question that begs for an answer, why did counsel allow him to plead guilty to an offense for which the State could not have proof of all the elements, for proof beyond a reasonable doubt verdict? Assault 1st degree must be shown by the essential element of "serious physical injury". See: Saylor v. State, 719 So. 2d. 266 (Ala. Cr. App. 1998) where this court stated:

> "The fact there could have been complications
> from an injury is not enough" and "while
> 'serious physical injury'does not require
> that death be likely, it does require a
> 'real hazard or death is imminent'"

None of the 4 passengers in the other automobile involved in this accident suffered any serious physical injury to warrant a charge of Assault 1st degree. Counsel never investigated how the Phenix City Police Department measured Ligon's rate of speed to warrant a charge of Murder (reckless). If he had, he would been told by Ligon that the police asked him to move his truck because it was blocking other traffic, then they took the measurements. Counsel was totally not interested in advocating for ligon.(R. 111-119)

Based on the following facts and law Ligon is due to have his plea vacated.

(15)

ARGUMENT

III.)

<u>THE TRIAL COURT WAS WITHOUT AUTHORITY TO
ACCEPT APPELLANT'S PLEA OF GUILTY WHEN
THE STATE AND COUNSEL FOR APPELLANT DID
MISREPRESENT MATERIAL FACTS TO THE COURT
AT THE PLEA HEARING, THEREBY, MAKING THE
PLEA OF APPELLANT NOT KNOWINGLY, GIVEN
OR INTELLIGENTLY AND VOLUNTARILY RENDRED.</u>

Ligon submits to this Honorable Court <u>uncontrovertable</u> evidence that

the prosecutor and his defense attorney engaged in subtefuge when testifying

at the Ligon's plea of guilty hearing by stating that the four (4) occupants

of the vehicle that Ligon crashed into suffered "serious physical injury" to

provide " a factual basis" for the trial court to accept his plea of guilty

to the offenses of Assault 1st degree, (4 counts).(R. 134-137)

Ligon's exhibits attached to this brief marked #6 thru #8 are depositions

of testimony given by the 3 adult occupants that were involved in the accident,

Taquanda Law; Lawanda Law, and Johnathan Law; the other occupant Cornelius Law

was spoken for by his mother Taquanda Law in her deposition. The depositions

were given because on an on-going civil suit filed by them against Ligon and

others. These documents clearly show that the 3 year-old child Cornelius Law

did not suffer any injuries at all, (negating at least one Assault 1st degree

charge) and that the 3 adult occupants did not suffer any serious physical

injuries to warrant the Assault 1st degree charges. The depositions do show

that the occupants "complained" of standard neck and/or back pain usually

associated with any rear-end collision, especially if a civil suit is being

contemplated. Taquanda Law was examined at the emergency room, and released

the same day, with no injuries stated in her deposition, and no treatments or

medications ordered by any physician. Lawanda Law, who was transported by

ambulance to the emergency room, and who, "the EMT Johnny, stated"... "was

faking", stayed in the hospital over-night for and released the next day

—with a prescription for muscle relaxants. The only passenger who may have has any physical injury is Johnathan Law, who was in a prior automobile accident in 1994, that he testified he received "back-pain". It can be deduced that the instant accident may have aggravated the old injury, as he was also released after an over-night stay in the hospital with a prescription for muscle relaxants, he stated he never re-newed after two-weeks treatment.

The testimony at the plea hearing by Mr. Landreau states that: "all four of the occupants had serious injuries, when asked by Judge Greene, : "Did Lawanda Law have serious bodily injury as the result of the accident? " Judge Greene the asked if Taquanda Law recieved serious bodily injuries as well, to which Mr, Landreau replys: "Yes. Your Honor". Further, Mr. Landreau testifys that: "Judge, they were all of the same nature. I believe a couple of them may have broken bones in addition to internal trauma and injury." Then Judge Greene asks: "All four of them remained in the hospital over a period of a day or several days, is that correct?" Mr. Armstrong answers in the affirmative by stating that: " Your Honor, I have read the case file extensively. and I do recall some having broken bones and having to stay in the hospital for an extensive period of time, but I don't recall if it was all four. I want to say it was three of them, but I can't quite remember." (R.136-137)

Ligon asserts that this testimony by both Mr. Landreau and his counsel Mr. Armstrong is in fact a violation of the Rules of Professional Conduct, Rule 3.3(a), "Candor Toward The Tribunal", wherein it states in part :

> (a): A lawyer shall not knowingly:
> (1) make a false statement of material fact or law to a tribunal;
> (3) offer evidence (testimony) that the lawyer knows to be false...

Ligon asserts that both Mr. Landreau and Mr. Armstrong engaged in professional misconduct at the plea hearing, in violation of Rule 8.4(c) "Misconduct" which states in part:  (c)"It is professional misconduct for a lawyer to: engage in conduct involving dishonesty, fraud, deceit or misrepresentation..."

Ligon asserts that the testimony of the occupants of the other car does contovert what Mr. Armstrong and Mr. Landreau stated to the trial court at the plea of guilty hearing, and that these misrepresentations mandate that an evidentiary hearing ordered or that Ligon's plea of guilty be vacated, for the false statements of officers of the court were given knowingly, and intentionally, with a reckless disregard for the truth thereby deceiving both the trial court and Ligon, therefore, rendering the court without authority to accept Ligon's plea of guilty to the indictments as charged.

CONCLUSION

The cumulative effect of the ineffective assistance of counsel, and the procedural irregularities that have occurred with the filing of the Rule 32 petition, coupled with the misrepresentations of material facts to the trial court and to Appellant, considered in the aggregate, is such that Appellant did not receive a fair trial and that he has been foreclosed to present his evidence to the court to advance his Rule 32 petition, as stated earlier in this brief, "one might think there was a conspiracy to thwart the filing of the Rule 32 petition". Furthermore, the depositions given in exhibits #6 thru #8, attached, do not support a charge or conviction for Assualt 1st degree, and leaves a nagging question as to what evidence was put foward to the Grand Jury of Russell County to warrant such indictments. Therefore, the convictions and subsequent sentence of Appellant are due to be set aside and the Appellant is due to be granted all such other further and different relief as this court may deem proper, and just.

Respectfully submitted, this the ___ day of _____, 2004.

Terry Ligon, #220217
V.C.F. -P.O.Box 767
Clayton, Al. 36016-0767

(18)

CERTIFICATE OF SERVICE

    I hereby certify that I have provided a copy of Appellant's Brief on Appeal with exhibits attached, by providing 6 copies of the same to this court with the Attorney General's copy duly marked and to be deposited in the Court Clerk's hand mail box for said party, on this the 1ᵗᵛ day of 4..(., 2004. I have mailed these copies via U.S. Mail, Special Handling, postage prepaid, to the Clerk of the Court, Court of Criminal Appeals, 300 Dexter Avenue, Montgomery, Al. 36104-3741.

    I also certify that the law-library at Ventress Correctional Facility does not carry the Courier New Type on their typewriters of which this brief was prepared, and that Appellant was unable to obtain any shade of blue for the front cover of Appellant's Brief. Appellant appolgizes to the court for any kind of inconvenience this may cause.

Terry Ligon, #220217
Ventress Correctional Facility
P.O. Box 767
Clayton, Al. 36016-0767

LAW OFFICES OF
## ROTHSCHILD & MORGAN, P.C.
Post Office Box 2788
Columbus, Georgia 31902-2788

JEROME M. ROTHSCHILD
W. DONALD MORGAN, JR.*
W. JOHN WILSON
ANDREW A. ROTHSCHILD*

ADMITTED IN GEORGIA AND ALABAMA

1025 First Avenue
Telephone No.  706-324-4157
Facsimile No.  706-324-1959

January 20, 2003

Mr. Terry Ligon
AIS #: 220217, Dorm 8-B
Ventress Correctional Facility
Post Office Box 767
Clayton, Alabama 36016

Dear Mr. Ligon:

This morning I received a letter from Mr. Robert Farrell who was obviously responding on your behalf to my earlier letter.

After I discussed the filing of the Rule 32 motion with the clerk's office and was given information that nothing had been filed, I actually went to the Russell County Courthouse myself and sat down with a friend of mine who works in the clerk's office. There is no question that you have attempted to file your Rule 32 motion. When a lawyer uses the term "filed" he normally means that the clerk has actually accepted the document, stamped it, and put it in the case record for action by the court. In your situation, there was a technical defect in your submission, that being the lack of an affidavit indicating that you should not be required to pay filing fees. I did locate that affidavit itself in Judge Greene's office later the same day. Based upon my investigation, I am certain that facts are sufficient to show that at the time you gave your deposition you were actively attempting to have a motion filed in the clerk's office for further action by the Judge.

Why is this even important? Because I suspect that the lawyers for Saturn and Evenflo will file a motion in your civil case to take a judgment against you for failure to cooperate in the discovery process. As you will recall, your deposition was ordered by Judge Albert Johnson. Your failure to comply with his order would allow the other parties in the case to file a motion for sanctions. The ultimate sanction is to have your answer stricken and a judgment entered against you.

APPELLANT'S
EXHIBIT " 1

Mr. Terry Ligon
January 20, 2003
Page 2

As a practical matter, any judgment entered against you is probably wasted effort because you have no money to pay such a judgment anyway. I do not, therefore, see this as practically harmful.

Nonetheless, it is my job to defend any motion for sanctions filed by other attorneys. The fact that a Rule 32 motion was being attempted at the time you gave your deposition is, I believe, a relevant fact to be argued in stating that the Judge was wrong in ordering you to give a deposition in the first place.

What this letter really relates to are the technical points of law regarding procedure. In the final analysis, what happens at this juncture is probably going to be meaningless in a practical sense. Based on correspondence I have had from other lawyers in the case within the last week, we will apparently go to Birmingham in early March for a mediation. A mediation is a process whereby the parties to a lawsuit attempt to settle the case. If we do settle the case, nothing that happened with regard to your deposition will be of any importance at all.

Again, thank you for responding to my earlier correspondence. I will certainly keep you informed of matters regarding the civil case as they develop. Also, as I have advised you in the past, it would certainly be in your best interest to find a lawyer to represent you with regard your Rule 32 motion and other aspects of the criminal case. I simply cannot represent you in that regard because I have almost no knowledge of that area of law practice.

Sincerely

ROTHSCHILD & MORGAN, P.C.

W. Donald Morgan, Jr.

WDMjr/pw/01235

IN THE CIRCUIT COURT OF _Russell_ COUNTY, ALABAMA


_TERRY LiGOR)_ ,
     Petitioner.


Vs.                       CASE. NO. _352, 353, 354, 355, 3:_


STATE OF ALABAMA,
     Respondent.


## MOTION FOR FREE TRANSCRIPT ORDER


Comes now, Petitioner, _TERRY L. GON_ , pro se, pursuant

to Code of Alabama § 12-22-190, et. seq.; and seeks an Order Granting

a free transcript; and shows the following:

    1) The Petitioner is indigent.

    2) The Petitioner is preparing to file a Rule 32 Petition

       for Post-conviction relief.

    3) One issue to be raised is ineffective assistance of Counsel;

       (Counsel failed to inform the Petitioner of his right

       to appeal.)

    4) The Petitioner can not properly prepare his Rule 32 Petition

       in compliance with Rule 32.6(b), Ala.R.Cri.P. without

       the transcript.

Where fore premises considered, Petitioner prays that this Honorable

Court will enter an order granting leave to receive a free copy

of the transcript of the proceedings on _DO1000 352, 353, 354, 355_

_,356  Assault I & MurDer_ .


                          Respectfully submitted,

                           _Terry Ligon_


                                 APPellant's

                                 Exhibit # 2

| State of Alabama<br>Unified Judicial System | **EXPLANATION OF RIGHTS AND<br>PLEA OF GUILTY**<br>(Non-Habitual Offender – Felony and Misdemeanor<br>Circuit or District Court) | Case Number |
|---|---|---|
| Form CR-51(front)    Rev. 7/96 | | *CC-01-356* |

IN THE ___*Circuit*___ COURT OF ___*Russell*___, ALABAMA
*(Circuit or District)*                    *(Name of County)*

STATE OF ALABAMA v. ___*Terry Ligon*___
                                        **Defendant**

**TO THE ABOVE-NAMED DEFENDANT:** The Court, having been informed that you wish to enter a plea of guilty in this case, hereby informs you of your rights as a criminal defendant.

## PENALTIES APPLICABLE TO YOUR CASE

You are charged with the crime of ___*Murder (Reckless)*___, which is a Class ___*A*___ ☒ Felony ☐ Misdemeanor. The Court has been informed that you desire to enter a plea of guilty to ☐ this offense or ☐ to the crime of ___ which is a ☐ felony ☐ misdemeanor. The sentencing range for the above crime(s) is set out below:

| MISDEMEANOR | | FELONY | |
|---|---|---|---|
| Class A | Up to one (1) year imprisonment in the county jail, or a fine up to $2,000, or both. | (Class A) | Not less than ten (10) years and not more than life or ninety-nine (99) years imprisonment in the state penitentiary, and may include a fine not to exceed $20,000. |
| Class B | Up to six (6) months imprisonment in the county jail, or a fine up to $1,000, or both. | Class B | Not less than two (2) years and not more than twenty (20) year imprisonment in the state penitentiary, and may include a fine not to exceed $10,000. |
| Class C | Up to three (3) months imprisonment in the county jail, or a fine not to exceed $500, or both. | Class C | Not less than one (1) year and one (1) day and not more than ten (10) years imprisonment in the state penitentiary, and may include a fine not to exceed $5,000. |

**Crime Victims Assessment:** You will also be ordered to pay an additional monetary penalty for the use and benefit of the Alabama Crime Victim Compensation Commission of not less than $50 and not more than $10,000 for each felony and not less than $25 and not more than $1,000 for each misdemeanor for which you are convicted.

This crime is also subject to the following enhancements or additional penalties as provided by law: (Provisions Checked Apply To Your Case)

☐ **Enhanced Punishment For Use Of Firearm Or Deadly Weapon:** Section 13A-5-6, Ala. Code 1975, provides for the enhancement of a punishment where a "firearm or deadly weapon was used or attempted to be used in the commission of a felony." This section provides for the following punishment in such event: For the commission of a Class A Felony, a term of imprisonment of not less than **20 years;** For the commission of a Class B Felony, a term of imprisonment of not less than **10 years;** For the commission of a Class C Felony, at term of imprisonment of not less than 10 years.

☐ **Enhanced Punishment for Drug Sale Near School:** Section 13A-12-250, Ala. Code 1975, provides that any person who is convicted of unlawfully selling any controlled substance within a three (3) mile radius of a public or private school, college, university or other educational institution, must be punished by an underlined additional penalty of five years' imprisonment for each violation.

☐ **Enhanced Punishment For Sales Of Controlled Substance To One Under 18:** Section 13A-12-215, Ala. Code 1975, provides that anyone convicted of selling, furnishing or giving away a controlled substance to one who has not yet attained the age of 18 years, shall be guilty of a Class A Felony and the punishment imposed shall not be suspended or probation granted.

☐ **Drug Demand Reduction Assessment Act and Loss of Driving Privileges:** Section 13A-12-281 provides that, if you are convicted of a violation of Sections 13A-12-202, 13A-12-203, 13A-12-204, 13A-12-211, 13A-12-212, 13A-12-213, 13A-12-215 or 13A-12-231, Ala. Code 1975, you shall be assessed an additional fee of $1,000 if you are a first-time offender or $2,000 if you are a repeat offender under one of these sections. Collection of all or part of the penalty will be suspended if, with court approval, you enter a drug rehabilitation program and if you agree to pay for a part or all of the program costs. Upon successful completion of the program, you may apply to the court to reduce the penalty by the amount actually paid by you for participation in the program. Any suspension of the penalty can be withdrawn by the court if you fail to enroll in or successfully pursue or otherwise fail to complete an approved program. In addition, pursuant to Section 13A-12-214 (unlawful possession of marijuana in the second degree), Section 32-5A-191(a)(3) or Section 32-5A-191(a)(4)(DUI offenses involving drugs), you will lose your privilege to drive a motor vehicle for a period of six months, which shall be in addition to any suspension or revocation otherwise provided by law.

☐ **Alcohol/Drug Related Offenses:** If you are convicted of an alcohol or drug-related offense, you will be required to undergo an evaluation for substance abuse. Based upon the results of any such evaluation, you will be required to complete the recommended course of education and/or treatment and to pay for the evaluation and any program to which you are referred. Failure to submit to an evaluation or failure to complete any program to which you may be referred will be considered a violation of any probation or parole you may be granted. You may also be required to attend monitoring sessions, including random drug and alcohol testing or blood, urine and/or breath, tests and to pay a fee for this service. You may request a waiver of part or all of the fee assessed if you are indigent or for any portion of time you are financially unable to pay. Community service may be ordered by the court in lieu of the monetary payment of fees as an indigent.

APPELLANT'S
EXHIBIT # 2-11

COUNTY OF MUSKOGEE
STATE OF GEORGIA


AFFIDAVIT


Re: TERRY LIGON
vs.
STATE OF ALABAMA


Before me the undersigned authority, a Notary Public in and for said county and State of Georgia at large, personally appeared Sharon Pearson, who being known to me and being by me first duly sworn, deposes and says the following:

My name is Sharon Pearson, and I am over the age of 21 years, and in sound mental health. This affidavit is prepared to support and attest to any conversations attended by me or that I may have participated in concerning Mr. Terry Ligon, Mr. Jeremy Armstrong, (attorney) and myself in Mr. Armstrong's office in Phenix City, Al., during the Summer/Fall seasons of 2001, the subject being an automobile accident in which Mr. Ligon was involved in Phenix City, and the criminal charges by the State of Alabama filed against him pursuant to that accident.

From the months of July to November, 2001, I did attend at the minimum, to the best of my memory, two (2) meetings with the above mentioned parties in Mr. Armstrong's office, and during those times Mr. Armstrong kept emphasizing that Mr. Ligon was in a lot of trouble and that he would be found guilty if he went to trial, and that the best thing for him (Mr. Ligon)to do was to plead guilty to the charges for a lesser sentence, because if he didn't he was sure to get 99 years to life in prison.

At one of the meetings I attended Mr. Armstrong said he tried to get the district attorney to go for 20 years and not 25 years. At no time during any of the meetings I attended did Mr. Armstrong ever discuss the case as if it were going to go to trial. Mr. Armstrong never discussed any defense possibilities or extenuating circumstances or evidence favorable for Mr. Ligon, nor did Mr. Armstrong mention that he interviewed any of the witnesses or alleged victims in the accident in my presence.

My purpose for being present at these meetings in Mr. Armstrong's office was because I had to drive Mr. Ligon to the office and he would ask me to accompany him in the office. On one occasion I was present when Mr. Ligon signed the plea of guilty form, and Mr. Armstrong explained some of the rights that Mr. Ligon would be waiving  pleading guilty. Mr. Armstrong never explained what constituted the offense of Murder or of Assault to Mr. Ligon in my presence at these meetings.

I swear under the penalty of perjury that the above statements by me are true and correct to the best of my knowledge and belief, so help me God!

Sharon Pearson
2806 Baldwin Street
Columbus, Ga. 3190_

Dorotha Abercrombie
My Commission Expires 4/22/06

My Commission Expires

Notary Public

APPELLANT'S
EXHIBIT
#
3

Mr. Armstrong never showed me my file or any of the documents he received from discovery or anywhere else that he might have supplemented my file and had I known about these documents and could have discussed them with Mr. Armstrong prior to my accepting the State's offer as advised by Mr. Armstrong, I would have refused the offer and gone to trial. Mr Armstrong told me that all the passengers in the other vehicle suffered serious injury and required to stay in the hospital for a long time and if I went to trial and they testified against me the jury would be very sympathetic to them. Mr. Armstrong misrepresented the injuries of these people to me and to Judge Greene at my plea hearing.

I swear under the penalty of perjury that the above statements by me are true and correct to the best of my knowledge and belief, so help me God!

Terry Ligon

Terry Ligon, #220217
Ventress Correctional Facility
P.O. Box 767
Clayton, Al. 36016-0767

Sworn to and subscribed before me on this the 17 day of June, 2004.

My Commission Expires Aug 18, 2007

My commission expires

Carolyn R. Abercrombie

Notary Public

| Form CR-51 (back)    Rev. 7/96 | EXPLANATION OF RIGHTS AND PLEA OF GUILTY |
|---|---|
| | (Non-Habitual Offender — Felony and Misdemeanor — Circuit or District Court) |

☐ DNA Samples for Criminal Offenses in Section 36-18-24: Beginning May 6, 1994, Section 36-18-25(e), Ala. Code 1975, provides that, an of May 6, 1994, all persons convicted of any of the offenses set out in Section 36-18-24, shall be ordered by the court to submit to the taking of a DNA sample samples.

☐ DUI Offenses: Beginning October 1, 1993, if you are convicted of a DUI offense pursuant to Section 32-5A-191, Ala. Code 1975, an additional fine of $100.00 will be assessed pursuant to Section 32-5A-191.1, Ala. Code 1975.

☐ Drug Possession: Beginning October 1, 1995, if you are convicted in any court of this state for drug possession, drug sale, drug trafficking, or drug paraphernalia offenses as defined in Sections 13A-12-211 to 13A-12-260, inclusive, Ala. Code 1975, an additional fee of $100.00 will be assessed pursuant to Section 36-18-7, Ala. Code 1975.

☐ Other: _____

### RIGHTS YOU HAVE AND THE WAIVER OF YOUR RIGHTS

Under the Constitution of the United States and the Constitution and laws of the State of Alabama, you have a right to remain silent and you may no be compelled to give evidence against yourself. Your attorney cannot disclose any confidential talks he/she has had with you. You do not have to answer any questions. If you do answer questions knowing that you have a right to silence, you will have waived your right to remain silent.

You have the right to enter, or stand on if previously entered, a plea of "Not Guilty" or Not Guilty by Reason of Mental Disease or Defect," or "Not Guilty and Not Guilty by Reason of Mental Disease or Defect" and have a public trial before a duly selected jury. The jury would decide your guilt or innocence based upon the evidence presented before them. If you elect to proceed to trial, you would have the right to be present, you would have the right to have you attorney present to assist you, you would have the right to confront and cross examine your accuser(s) and all the State's witnesses, you would have the right to subpoena witnesses to testify on your behalf and to have their attendance in court and their testimony required by the court, you would have the right to take the witness stand and to testify, but only if you chose to do so, as no one can require you to do this. If you elect to testify, you can be cross examined by the State just as any other witness is subjected to cross examination. If you elect not to testify, no one but your attorney will be allowed to comment about that fact to the jury. Your attorney is bound to do everything he/she can honorably and reasonably do to see that you obtain a fair and impartial trial.

If you elect to proceed to trial, you come to court presumed to be innocent. This presumption of innocence will follow you throughout the trial until the State produces sufficient evidence to convince the jury (or the court if the trial is non-jury) of your guilt beyond a reasonable doubt. You have no burden of proof in this case. If the State fails to meet its burden, you would be found not guilty.

If you are entering a guilty plea to a charge for which you have not yet been indicted, you are waiving indictment by a grand jury and you will be pleading guilty to a charge preferred against you by a District Attorney's Information filed with the court.

IF YOU PLEAD GUILTY, THERE WILL BE NO TRIAL. YOU WILL BE WAIVING THE RIGHTS OUTLINED ABOVE, EXCEPT YOUR RIGHTS RELATING TO REPRESENTATION BY AN ATTORNEY. THE STATE WILL HAVE NOTHING TO PROVE AND YOU WILL STAND GUILTY ON YOUR GUILTY PLEA. YOU WILL, HOWEVER, HAVE THE RIGHT TO APPEAL.

IF YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS OR THE CONSEQUENCES OF PLEADING GUILTY, PLEASE LET THE COURT KNOW NOW AND FURTHER EXPLANATION WILL BE MADE.

_9/10/01_
Date

_____
Judge

### ATTORNEY'S CERTIFICATE

I certify that the above was read to the defendant by me; that I explained the penalty or penalties to the defendant, that I discussed in detail the defendant's rights and the consequences of pleading guilty; and that, in my judgment, the defendant understands the same and that he/she is knowingly voluntarily, and intelligently waiving his/her rights and entering a voluntary and intelligent plea of guilty. I further certify to the court that I have in no way forced or induced the defendant to plead guilty and, to my knowledge, no one else has done so.

_9/10/01_
Date

_J. W. Armstrong_
Attorney

### DEFENDANT'S STATEMENT OF WAIVER OF RIGHTS AND PLEA OF GUILTY

I certify to the court that my attorney has read and explained the matters set forth above; that my rights have been discussed with me in detail and full explained; that I understand the charge or charges against me; that I understand my rights, the punishment or punishments provided by law as they may apply to my case, and I understand the consequences of pleading guilty; that I am not under the influence of any drugs, medicines, or alcoholic beverages; an I have not been threatened or abused or offered any inducement, reward, or hope or reward to plead guilty other than the terms of the plea agreement which will be stated on the record.

I further state to the court that I am guilty of the charge to which I am entering a plea of guilty, that I desire to plead guilty, that I made up my own min to plead guilty, and that I knowingly, intelligently, and voluntarily waive my right to a trial in this case. I further state to the court that I am satisfied with m attorney's services and his/her handling of my case.

_9/10/01_
Date

_Terry Ligon_
Defendant

COUNTY OF BARBOUR
STATE OF ALABAMA

## AFFIDAVIT

Re: <u>CR-03-1173</u>

<u>TERRY LIGON vs. STATE OF ALABAMA</u>

Before me the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared Terry Ligon, #220217, who being known to me and being first duly sworn, deposes and says the following:

My name is Terry Ligon, and I am over the age of 21 years, and in sound mind. This affidavit is prepared in support and conjunction of a Rule 32, A.R.Cr.P., petition for post-conviction relief, and the appeal of the dismissal of said petition by the trial court concerning my conviction in the Circuit Court of Russell County, Al., (Case Nos. CC-01-352-356), whereby criminal charges were filed against me when I was involved in an automobile accident on March 25, 2001.

During my criminal prosecution, I was represented by court-appointed attorney, Mr. Jeremy Armstrong, of Phenix City, Al.. His representation of me was from July to November, 2001, as I best remember, whereby pursuant to his advice I plead guilty to Murder and Assault 1st degree, (4 counts) and received a 25 year sentence for said offenses. Prior to the plea and sentencing hearing I met with Mr. Armstrong in his office in Phenix City, several times to discuss my case. During these meetings Mr. Armstrong kept telling me I am in a lot of trouble, and that if I went to trial I would be found guilty and receive a 99 year sentence or a Life sentence. At no time during these meetings did Mr. Armstrong ever show me any of the State's evidence that might be used to convict me, no police reports ; no medical reports; no forensic reports; and no statements from any witnesses, although Mr. Armstrong did tell me he filed a Motion for Discovery with the district attorney's office, I never did see any of that discovery until a year after the accident and my incarceration, when I wrote to him and asked for my file.

Mr. Armstrong never explained the law to me as pertained to the statutes I was charged with, only did he state that the Murder charge was a class A felony and the Assault charge was a class B felony. Mr. Armstrong never showed me the indictments although he did read them to me, he was very firm about me pleading guilty and never discussed any defense possibilities if I went to trial, saying that the Governor of Alabama wants "drunk-drivers" dealt with very harshly.

The reason for me filing the Rule 32 petition was because I learned that none of the 4 people in the other vehicle suffered any serious physical injuries, and Mr. Armstrong told me differently, so I requested him to please send me my file. After reading some of the documents in my file, namely the statement by Ms. Law to the police after the accident I realized that it was true that she could not have suffered any serious injury according to her actions, plus in that statement she says that the EMT thought her sister was faking. This document lead me to investigate my case further and thereby discovering other discrepencies that contradict what Mr. Armstrong led me to believe and/or did not reveal to me. I now realized that I should t. have plead guilty and should have gone to trial because one of the documents shows that Ms. Law was in violation of the law also, by making an illegal left-hand turn on a major highway, and my position was that two-wrongs don't make right, so I wanted to take my plea back, by filing the Rule 32 petition.

APPELLANT'S
EXHIBIT N
4

# In The Matter Of:

*TAQUONNA LAW, ET AL.   v.*
*TERRY LIGON, ET AL.*

---

*LAWANDA LAW*
*January 7, 2003*

---

*TYLER, EATON, MORGAN, NICHOLS & PRITCHETT*
*COURT REPORTING*
*1975 SOUTHTRUST TOWER*
*420 NORTH TWENTIETH STREET*
*BIRMINGHAM, AL  35203*
*(205) 252-9152    FAX: (205) 252-0196*

*Original File LAWL.V1, 150 Pages*
*Min-U-Script® File ID: 2537849815*

## Word Index included with this Min-U-Script®

APPELLANT'S
EXHIBIT # 6.

## Page 1

[1]      IN THE CIRCUIT COURT

[2]   OF THE TWENTY-SIXTH JUDICIAL CIRCUIT

[3]   IN AND FOR RUSSELL COUNTY, ALABAMA

[4]

[5]

[6] CIVIL ACTION NO. CV-01-0311

[7]

[8] TAQUONNA LAW, et al.,

        Plaintiffs,

[9]

     vs.

[10]

     TERRY LIGON, et al.,

[11]    Defendants.

[12]

[13]

[14]      DEPOSITION

[15]         of

[16]      LAWANDA LAW

[17]    JANUARY 7, 2003

[18]

[19]

[20]

[21] TAKEN BEFORE: Donald R. Eaton

[22]    Registered Professional

[23]    Reporter and Notary Public

## Page 2

[1]      STIPULATION

[2]      IT IS STIPULATED AND AGREED,

[3] by and between the parties, through their

[4] respective counsel, that the deposition

[5] of LAWANDA LAW may be taken before Donald

[6] R. Eaton, Commissioner, Registered

[7] Professional Reporter and Notary Public,

[8] State at Large;

[9]      That the signature to and

[10] reading of the deposition by the witness

[11] is waived, the deposition to have the

[12] same force and effect as if full

[13] compliance had been had with all laws and

[14] rules of Court relating to the taking of

[15] depositions;

[16]      That it shall not be necessary

[17] for any objections to be made by counsel

[18] to any questions, except as to form or

[19] leading questions, and that counsel for

[20] the parties may make objections and

[21] assign grounds at the time of trial, or

[22] at the time said deposition is offered in

[23] evidence, or prior thereto.

## Page 3

[1]      APPEARANCES

[2]

[3] FOR THE PLAINTIFF:

[4]   Mr. Douglas J. Fees

[5]   Attorney at Law

[6]   Douglas J. Fees, P.C.

[7]   401 Madison Street

[8]   Huntsville, Alabama 35804

[9]

[10] FOR THE DEFENDANT, EVENFLO COMPANY, INC.:

[11]   Ms. Teresa G. Minor

[12]   Attorney at Law

[13]   Balch & Bingham

[14]   1710 Sixth Avenue North

[15]   Birmingham, Alabama 35203

[16]      -and-

[17]   Mr. James R. McKoon

[18]   Attorney at Law

[19]   McKoon, Thomas & Gray

[20]   Post Office Box 3220

[21]   Phenix City, Alabama 36868-3220

[22]

[23]

## Page 4

[1] APPEARANCES, (CONTINUING)

[2]

[3] FOR THE DEFENDANT, TERRY LIGON:

[4]   Mr. Andrew Rothschild

[5]   Attorney at Law

[6]   Rothschild & Morgan

[7]   Post Office Box 2788

[8]   Columbus, Georgia 31902-2788

[9]

[10] FOR THE DEFENDANT, SATURN CORPORATION:

[11]   Mr. Marc Dawsey

[12]   Attorney at Law

[13]   Flumberger, Kirk & Caldwell

[14]   2700 Highway 280 East

[15]   Suite 480

[16]   Birmingham, Alabama 35223-2446

[17]

[18] OTHERS PRESENT:

[19]   Mr. Jonathan Law

[20]

[21]

[22]

[23]

[1]          INDEX

[2]                     PAGE:

[3] EXAMINATION BY MR. DAWSEY............ 7

[4] EXAMINATION BY MS. MINOR............. 97

[5] REEXAMINATION BY MR. DAWSEY......... 114

[6] REEXAMINATION BY MS. MINOR......... 114

[7] REEXAMINATION BY MR. DAWSEY......... 116

[8]

[9]      DEFENDANT'S EXHIBITS

[10]

[11] Exhibit 1............................. 7

[12] Exhibit 2............................ 87

[13] Exhibit 3............................ 97

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[1] I, Donald R. Eaton, a
[2] Registered Professional Reporter of
[3] Birmingham, Alabama, and a Notary Public
[4] for the State of Alabama at Large, acting
[5] as Commissioner, certify that on this
[6] date, pursuant to Rule 30 of the Alabama
[7] Rules of Civil Procedure and the
[8] foregoing stipulation of counsel, there
[9] came before me at 379 Highway 239, 925
[10] Broad Street, Phenix City, Alabama, on
[11] the 7th day of January, 2003, commencing
[12] at 11:35 a.m., JONATHAN LAW, witness in
[13] the above cause, for oral examination,
[14] whereupon the following proceedings were
[15] had:
[16]
[17]    THE REPORTER: Same
[18] stipulations?
[19]    MR. FEES: Yes.
[20]    MR. DAWSEY: And, again I want
[21] to reserve on the record the right to
[22] re-depose Mr. Law in light of his failure
[23] to answer sufficiently interrogatories or

[1] respond to Saturn's request for
[2] production, which there's a pending
[3] motion to compel, —
[4]    MR. FEES: That's fine.
[5]    MR. DAWSEY: — regarding
[6] anything that might come up.
[7]
[8]    JONATHAN LAW,
[9] being first duly sworn, was examined and
[10] testified as follows:
[11]
[12]          EXAMINATION BY MR. DAWSEY:
[13]    Q: Mr. Law, I'm Marc Dawsey. I
[14] know we met yesterday, and you have been
[15] sitting through these depositions all
[16] day. I'm marking a five-page document as
[17] Defendant's Exhibit 1 to your deposition.
[18]    (Whereupon, Defendant's
[19] Exhibit 1 was marked
[20] for identification.)
[21]    Q: Have you seen that document
[22] before?
[23]    A: Yes.

[1]    Q: Did you bring anything with
[2] you responsive to the request made in
[3] that document?
[4]    A: No.
[5]    MR. DAWSEY: Doug, again just
[6] for the record, I want to reserve the
[7] right to re-depose Mr. Law with respect
[8] to responsive information that he has in
[9] his possession that he did not bring with
[10] him pursuant to our deposition notice.
[11]    MR. FEES: That's fine.
[12]    Q: (BY MR. DAWSEY:) Mr. Law,
[13] have you ever given a deposition before?
[14]    A: No.
[15]    Q: Have you ever been a witness
[16] at trial?
[17]    A: No.
[18]    Q: I think you've kind of seen
[19] how we do things. I ask questions; you
[20] answer them. At any time you don't
[21] understand what I'm asking you, please
[22] ask me to rephrase the question. If you
[23] do answer the question, I'm going to

[1] what are you talking about?

[2]   A: Depends on the weight.

[3]   Q: Anything else other than being

[4] unable to lift heavy objects that your

[5] neck and back prevent you from doing?

[6]   A: No.

     Q: Did you ever receive any

[8] treatment for your neck and back

[9] following the accident?

[10]   A: I have a prescription for some

[11] pills, I think muscle relaxers for the

[12] first time. And then as I went back to

[13] the doctor, I couldn't aff   d anymore, so

[14] I never — I didn't get them, the pills.

[15]   Q: You never had the prescription

[16] filled?

[17]   A: Once.

[18]   Q: You only had it filled once?

[19]   A: Right.

[20]   Q: Where did you have that

[21] prescription filled?

[22]   A: I don't recall.

[23]   Q: Who was the doctor that

[1] prescribed that for you?

[2]   A: I don't recall.

[3]   Q: Did you ever visit any doctors

[4] for neck and backaches following the

[5] accident?

[6]   A: They sent me to the health

[7] department. I don't recall the doctor's

[8] name, though.

[9]   Q: Is it the Georgia Health

[10] Department, Alabama?

[11]   A: It was in Georgia.

[12]   Q: Is that a county agency?

[13]   A: I'm not sure.

[14]   Q: Other than the doctors at the

[15] health department, did you see any other

[16] doctors for injuries arising out of this

[17] accident?

[18]   A: No.

[19]   Q: Were you treated at the

[20] hospital immediately after the accident?

[21]   A: Yes.

[22]   Q: Columbus Medical Center?

[23]   A: Yes.

[1]   Q: Did you ever go to Columbus

[2] Medical Center any other time other than

[3] immediately after the accident for

[4] injuries sustained in this accident?

[5]   A: No.

[6]   Q: Were you smoking a cigarette

[7] at the time of the accident?

[8]   A: I can't recall.

[9]   Q: Were you smoking in the car

[10] during the time —

[11]   A: Of the collision?

[12]   Q: Between the time you left your

[13] mother's house going to Cornelius'

[14] grandmother's house?

[15]   A: Probably.

[16]   Q: Did you have your window

[17] rolled down?

[18]   A: I probably had it cracked.

[19]   Q: Did you roll it up before the

[20] accident?

[21]   A: I can't recall.

[22]   Q: What were your activities that

[23] Sunday before the accident?

[1]   A: Getting up in the morning. I

[2] took a shower. I got dressed, went on to

[3] church. We left the church and went back

[4] to mamma's house. After we left mamma's

[5] house, we went to Captain Tom's. We sat

[6] there and ate. I forgot who I rode back

[7] to mamma's house with. But after a

[8] while, they, Taquonna and Lawanda came

[9] and picked my up and we headed to Phenix

[10] City.

[11]   Q: Was the trip between your

[12] mother's house going to Phenix City prior

[13] to the subject accident the only time you

[14] rode with Taquonna on the day of the

[15] accident?

[16]   A: This is the only time that I

[17] rode with her?

[18]   Q: That Sunday of the accident,

[19] yes.

[20]   A: Yes.

[21]   Q: Okay. Do you remember

[22] buckling your seat belt when you got into

[23] the car at your mother's house?

LAWANDA LAW, Case 3:05-cv-00707-MEF-CSC   Document 6-5   Filed 08/23/2005 TAQUONNA LAW, ET AL. v.

January 7, 2003

**Page 45**

[1] the hospital. And I took him, I followed
[2] him up with his doctor the following day
[3] or whatever — not the following day,
[4] when I got out of the hospital. But he
[5] didn't have any injuries. He was just
[6] shaken up. No injuries.
[7]   **Q:** And what was marked as
[8] Defendant's Exhibit 38 to your sister
[9] Taquonna's deposition yesterday, it's the
[10] second amended complaint against Saturn.
[11] One of the plaintiffs is Cornelius Law, a
[12] minor, by and through his natural mother
[13] and next friend, Lawanda Law. Are you
[14] making any claim against Saturn for
[15] damages allegedly suffered by Cornelius
[16] in this accident?
[17]   **A:** No.
[18]   **Q:** So you do not hold Saturn
[19] responsible in any way for anything that
[20] has happened to Cornelius because of this
[21] accident?
[22]   **A:** No.
[23]   **MR. DAWSEY:** Off the record.

**Page 46**

[1]   (Off-the-record discussion.)
[2]   **Q:** (BY MR. DAWSEY:) The day of
[3] the accident, I believe it occurred on a
[4] Sunday, correct?
[5]   **A:** Correct.
[6]   **Q:** What did you do that morning?
[7]   **A:** I don't recall.
[8]   **Q:** Do you remember what time you
[9] woke up that day?
[10]   **A:** No. I don't recall. I don't
[11] know.
[12]   **Q:** Did you go to church that
[13] morning?
[14]   **A:** Correct.
[15]   **Q:** Did you go to the same church
[16] that Taquonna went to?
[17]   **A:** Correct.
[18]   **Q:** And it started at 11:00, the
[19] service did, correct?
[20]   **A:** Correct.
[21]   **Q:** Then the service lasted from
[22] 11:00 until when?
[23]   **A:** It's always lasted from 11:00

**Page 47**

[1] until 2:00.
[2]   **Q:** Did you stay the whole time?
[3]   **A:** Yes.
[4]   **Q:** When you left the church,
[5] where did you go?
[6]   **A:** To my mother's house.
[7]   **Q:** And who did you ride with?
[8]   **A:** From church?
[9]   **Q:** From church.
[10]   **A:** My mother.
[11]   **Q:** Was that in her Chrysler?
[12]   **A:** Yes, yes.
[13]   **Q:** Were both children with you?
[14]   **A:** No.
[15]   **Q:** Who was with you?
[16]   **A:** Cornelius.
[17]   **Q:** Where was Aayonna?
[18]   **A:** She was with my aunt.
[19]   **Q:** How old was Cornelius at that
[20] time?
[21]   **A:** He was about one and a half, I
[22] guess.
[23]   **Q:** Was he in a child restraint

**Page 48**

[1] system as you rode from the church to
[2] your mother's apartment?
[3]   **A:** No. He was in a seat.
[4]   **Q:** Did he have a seat belt on?
[5]   **A:** Correct.
[6]   **Q:** Was he seated in the back
[7] seat?
[8]   **A:** Correct.
[9]   **Q:** How long did you stay at your
[10] mother's house?
[11]   **A:** I don't know the correct time.
[12] I just stayed there until Taquonna came
[13] to pick me up.
[14]   **Q:** I know Taquonna mentioned that
[15] she went to Captain Tom's restaurant to
[16] eat lunch. Did you go to Captain Tom's
[17] also?
[18]   **A:** Right. She came and picked me
[19] up from mother's house and went to
[20] Captain Tom's.
[21]   **Q:** So she picked you up from your
[22] mother's, and then y'all went to Captain
[23] Tom's?

# In The Matter Of:

*TAQUONNA LAW, ET AL.   v.*
*TERRY LIGON, ET AL.*

---

*TAQUONNA LAW*
*January 7, 2003*

---

*TYLER, EATON, MORGAN, NICHOLS & PRITCHETT*
*COURT REPORTING*
*1975 SOUTHTRUST TOWER*
*420 NORTH TWENTIETH STREET*
*BIRMINGHAM, AL  35203*
*(205) 252-9152    FAX: (205) 252-0196*

*Original File LAW1.V1, 339 Pages*
*Min-U-Script® File ID: 3696092857*

# Word Index included with this Min-U-Script®

APPELLANTS

**TAQUONNA LAW**
**January 7, 2003**

TAQUONNA LAW, ET AL.    v.
TERRY LIGON, ET AL.

Page 5

[1]        INDEX

[2]

[3]                    PAGE

[4] EXAMINATION BY MS. MINOR............ 10

[5] EXAMINATION BY MR. DAWSEY........... 191

[6] REEXAMINATION BY MS. MINOR...... .... 322

[7] REEXAMINATION BY MR. DAWSEY........ 328

[8] REEXAMINATION BY MS. MINOR......... 337

[9]

[10]      DEFENDANT'S EXHIBITS

[11]

[12] Exhibit 1..................41

[13] Exhibit 2..................170

[14] Exhibit 3..................135

[15] Exhibits 4 & 5.................. 44

[16] Exhibit 6..................47

[17] Exhibit 7..................176

[18] Exhibit 8..................162

[19] Exhibit 9..................165

[20] Exhibit 10..................32

[21] Exhibit 11..................168

[22] Exhibit 12..................169

[23] Exhibit 13..................180

Page 6

[1]        INDEX(Continuing)

[2]

[3]      DEFENDANT'S EXHIBITS

[4] Exhibit 14..................183

[5] Exhibit 15..................30

[6] Exhibit 16..................36

[7] Exhibit 17..................39

[8] Exhibit 18 through 26.................68

[9] Exhibit 27..................96

[10] Exhibit 28..................134

[11] Exhibits 29 and 30.................. 185

[12] Exhibit 31..................188

[13] Exhibit 32..................240

[14] Exhibit 33..................243

[15] Exhibit 34..................244

[16] Exhibit 35..................245

[17] Exhibit 36..................246

[18] Exhibit 37..................249

[19] Exhibit 38..................335

[20] Exhibit 39..................191

[21]

[22]

[23]

Page 7

[1] I, Donald R. Eaton, a

[2] Registered Professional Reporter of

[3] Birmingham, Alabama, and a Notary Public

[4] for the State of Alabama at Large, acting

[5] as Commissioner, certify that on this

[6] date, pursuant to Rule 30 of the Alabama

[7] Rules of Civil Procedure and the

[8] foregoing stipulation of counsel, there

[9] came before me at 379 Highway 239, 925

[10] Broad Street, Phenix City, Alabama, on

[11] the 7th day of January, 2003, commencing

[12] at 9:05 a.m., TAQUONNA LAW, witness in

[13] the above cause, for oral examination,

[14] whereupon the following proceedings were

[15] had:

[16]

[17]    THE REPORTER: Will we have

[18] the usual stipulations?

[19]    MR. FEES: That's fine with

[20] us.

[21]    MR. DAWSEY: Yes.

[22]

[23]

Page 8

[1]    TAQUONNA LAW,

[2] being first duly sworn, was examined and

[3] testified as follows:

[4]

[5]    MS. MINOR: I'm going to go

[6] ahead and put an exhibit sticker on the

[7] child restraint system, Defendant's

[8] Exhibit 15. And let the record reflect

[9] Mr. Fees will retain custody.

[10]    MR. DAWSEY: For the record,

[11] I'm going to take some pictures, too,

[12] that I may or may not use as exhibits.

[13] Also, Doug, for the record, we had a

[14] conversation yesterday regarding who was

[15] going to maintain their cause of action

[16] against Saturn. Before we get started

[17] today, I want to confirm for the record

[18] that the only plaintiff that's going to

[19] maintain a cause of action against Saturn

[20] is Taquonna Law on behalf of Khalil

[21] Sutton and that all other plaintiffs will

[22] dismiss their causes of action with

[23] prejudice against Saturn.

Page 5

[1]        INDEX

[2]

[3]                    PAGE

[4] EXAMINATION BY MS. MINOR ............ 10

[5] EXAMINATION BY MR. DAWSEY ........... 191

[6] REEXAMINATION BY MS. MINOR ......... 322

[7] REEXAMINATION BY MR. DAWSEY ....... 328

[8] REEXAMINATION BY MS. MINOR ......... 337

[9]

[10]       DEFENDANT'S EXHIBITS

[11]

[12] Exhibit 1 ............................ 41

[13] Exhibit 2 ............................ 170

[14] Exhibit 3 ............................ 135

[15] Exhibits 4 & 5 ................... 44

[16] Exhibit 6 ............................ 47

[17] Exhibit 7 ............................ 176

[18] Exhibit 8 ............................ 162

[19] Exhibit 9 ............................ 165

[20] Exhibit 10 .......................... 32

[21] Exhibit 11 .......................... 168

[22] Exhibit 12 .......................... 169

[23] Exhibit 13 .......................... 180

Page 6

[1]        INDEX(Continuing)

[2]

[3]        DEFENDANT'S EXHIBITS

[4] Exhibit 14 .......................... 183

[5] Exhibit 15 .......................... 30

[6] Exhibit 16 .......................... 36

[7] Exhibit 17 .......................... 39

[8] Exhibit 18 through 26 ............... 68

[9] Exhibit 27 .......................... 96

[10] Exhibit 28 ......................... 134

[11] Exhibits 29 and 30 ................. 185

[12] Exhibit 31 ......................... 188

[13] Exhibit 32 ......................... 240

[14] Exhibit 33 ......................... 243

[15] Exhibit 34 ......................... 244

[16] Exhibit 35 ......................... 245

[17] Exhibit 36 ......................... 246

[18] Exhibit 37 ......................... 249

[19] Exhibit 38 ......................... 335

[20] Exhibit 39 ......................... 191

[21]

[22]

[23]

Page 7

[1] I, Donald R. Eaton, a

[2] Registered Professional Reporter of

[3] Birmingham, Alabama, and a Notary Public

[4] for the State of Alabama at Large, acting

[5] as Commissioner, certify that on this

[6] date, pursuant to Rule 30 of the Alabama

[7] Rules of Civil Procedure and the

[8] foregoing stipulation of counsel, there

[9] came before me at 379 Highway 239, 925

[10] Broad Street, Phenix City, Alabama, on

[11] the 7th day of January, 2003, commencing

[12] at 9:05 a.m., TAQUONNA LAW, witness in

[13] the above cause, for oral examination,

[14] whereupon the following proceedings were

[15] had:

[16]

[17]    THE REPORTER: Will we have

[18] the usual stipulations?

[19]    MR. FEES: That's fine with

[20] us.

[21]    MR. DAWSEY: Yes.

[22]

[23]

Page 8

[1]    TAQUONNA LAW,

[2] being first duly sworn, was examined and

[3] testified as follows:

[4]

[5]    MS. MINOR: I'm going to go

[6] ahead and put an exhibit sticker on the

[7] child restraint system, Defendant's

[8] Exhibit 15. And let the record reflect

[9] Mr. Fees will retain custody.

[10]    MR. DAWSEY: For the record,

[11] I'm going to take some pictures, too,

[12] that I may or may not use as exhibits.

[13] Also, Doug, for the record, we had a

[14] conversation yesterday regarding who was

[15] going to maintain their cause of action

[16] against Saturn. Before we get started

[17] today, I want to confirm for the record

[18] that the only plaintiff that's going to

[19] maintain a cause of action against Saturn

[20] is Taquonna Law on behalf of Khalil

[21] Sutton and that all other plaintiffs will

[22] dismiss their causes of action with

[23] prejudice against Saturn.

---

Page 29

[1]  **A:** No.

[2]  **Q:** Do you have any relatives over

[3] the age of 18 that live here in Russell

[4] County?

[5]  **A:** Yes.

[6]  **Q:** Can you tell me who they are?

[7]  **A:** Lawanda Law.

[8]  **Q:** That's your sister who is here

[9] with us today?

[10]  **A:** Yes.

[11]  **Q:** Anyone else?

[12]  **A:** No.

[13]  **Q:** Ms. Law, I know that we have

[14] the child restraint here with us today

[15] that your son was in at the time of the

[16] accident, and I need to ask you some

[17] questions about it. I realize this is

[18] going to be very difficult for you. If

[19] you want to take a break at any time, you

[20] just let me know, okay?

[21]  **A:** Okay.

[22]  **Q:** We're going to get out the

[23] child restraint now. And for the record,

---

Page 30

[1] we're going to identify it as Exhibit 15

[2] to Ms. Law's deposition.

[3]  (Whereupon, Defendant's

[4] Exhibit 15 was marked

[5] for identification and

[6] retained by counsel

[7] for plaintiff.)

[8]  **Q:** Ms. Law, is this the child

[9] restraint that Khalil was riding in at

[10] the time of the accident?

[11]  **A:** Yes.

[12]  **Q:** You recognize it?

[13]  **A:** Yes.

[14]  **Q:** Does it appear to be in the

[15] same condition that it was in after the

[16] accident? Anything different or changed?

[17]  **A:** (No response.)

[18]  **Q:** Take your time.

[19]  **A:** Could you repeat the question?

[20]  **Q:** Does it appear to be in the

[21] same condition that it was in after your

[22] accident?

[23]  **A:** I didn't see it after the

---

Page 31

[1] accident. I didn't have a chance to see

[2] the car seat after the accident.

[3]  **Q:** Does it appear to be in the

[4] same condition that it was in before the

[5] accident?

[6]  **A:** No.

[7]  **Q:** How is it different?

[8]  **A:** Both sides are broken.

[9]  **Q:** You mean the —

[10]  **A:** This (indicating).

[11]  **Q:** The shell?

[12]  **A:** Yes.

[13]  **Q:** The gray shell. And for the

[14] record, she was pointing to both sides,

[15] right and left of the shell. Any other

[16] difference?

[17]  **A:** No other difference.

[18]  MR. FEES: Besides the obvious

[19] blood stains from the injuries.

[20]  **Q:** And was the harness located —

[21] it's right now in the bottom of the three

[22] slots. Is that where it was at the time

[23] of the accident?

---

Page 32

[1]  **A:** Yes.

[2]  **Q:** If it will help you, and I'm

[3] not meaning to upset you, but we do have

[4] some photographs that the police

[5] department took after the accident, one

[6] that I've marked as Defendant's Exhibit

[7] 10 that they took of the seat following

[8] the accident.

[9]  (Whereupon, Defendant's

[10] Exhibit 10 was marked

[11] for identification.)

[12]  **Q:** Would you agree with me that

[13] in Defendant's Exhibit 10 the harness is

[14] in the bottom of the three slots as what

[15] we currently have in the child restraint

[16] marked Defendant's Exhibit 15?

[17]  **A:** Yes.

[18]  **Q:** If you could, Ms. Law, were

[19] you the one that restrained Khalil in the

[20] child restraint prior to the accident?

[21]  **A:** Yes.

[22]  **Q:** Where was the child restraint

[23] located in the Saturn?

---

Min-U-Script®

TAQUONNA LAW
January 7, 2003

---

Page 29

[1]  **A:** No.

[2]  **Q:** Do you have any relatives over

[3] the age of 18 that live here in Russell

[4] County?

[5]  **A:** Yes.

[6]  **Q:** Can you tell me who they are?

[7]  **A:** Lawanda Law.

[8]  **Q:** That's your sister who is here

[9] with us today?

[10]  **A:** Yes.

[11]  **Q:** Anyone else?

[12]  **A:** No.

[13]  **Q:** Ms. Law, I know that we have

[14] the child restraint here with us today

[15] that your son was in at the time of the

[16] accident, and I need to ask you some

[17] questions about it. I realize this is

[18] going to be very difficult for you. If

[19] you want to take a break at any time, you

[20] just let me know, okay?

[21]  **A:** Okay.

[22]  **Q:** We're going to get out the

[23] child restraint now. And for the record,

---

Page 30

[1] we're going to identify it as Exhibit 15

[2] to Ms. Law's deposition.

[3]    (Whereupon, Defendant's

[4] Exhibit 15 was marked

[5] for identification and

[6] retained by counsel

[7] for plaintiff.)

[8]  **Q:** Ms. Law, is this the child

[9] restraint that Khalil was riding in at

[10] the time of the accident?

[11]  **A:** Yes.

[12]  **Q:** You recognize it?

[13]  **A:** Yes.

[14]  **Q:** Does it appear to be in the

[15] same condition that it was in after the

[16] accident? Anything different or changed?

[17]  **A:** (No response.)

[18]  **Q:** Take your time.

[19]  **A:** Could you repeat the question?

[20]  **Q:** Does it appear to be in the

[21] same condition that it was in after your

[22] accident?

[23]  **A:** I didn't see it after the

---

Page 31

[1] accident. I didn't have a chance to see

[2] the car seat after the accident.

[3]  **Q:** Does it appear to be in the

[4] same condition that it was in before the

[5] accident?

[6]  **A:** No.

[7]  **Q:** How is it different?

[8]  **A:** Both sides are broken.

[9]  **Q:** You mean the —

[10]  **A:** This (indicating).

[11]  **Q:** The shell?

[12]  **A:** Yes.

[13]  **Q:** The gray shell. And for the

[14] record, she was pointing to both sides,

[15] right and left of the shell. Any other

[16] difference?

[17]  **A:** No other difference.

[18]    **MR. FEES:** Besides the obvious

[19] blood stains from the injuries.

[20]  **Q:** And was the harness located —

[21] it's right now in the bottom of the three

[22] slots. Is that where it was at the time

[23] of the accident?

---

Page 32

[1]  **A:** Yes.

[2]  **Q:** If it will help you, and I'm

[3] not meaning to upset you, but we do have

[4] some photographs that the police

[5] department took after the accident, one

[6] that I've marked as Defendant's Exhibit

[7] 10 that they took of the seat following

[8] the accident.

[9]    (Whereupon, Defendant's

[10] Exhibit 10 was marked

[11] for identification.)

[12]  **Q:** Would you agree with me that

[13] in Defendant's Exhibit 10 the harness is

[14] in the bottom of the three slots as what

[15] we currently have in the child restraint

[16] marked Defendant's Exhibit 15?

[17]  **A:** Yes.

[18]  **Q:** If you could, Ms. Law, were

[19] you the one that restrained Khalil in the

[20] child restraint prior to the accident?

[21]  **A:** Yes.

[22]  **Q:** Where was the child restraint

[23] located in the Saturn?

---

TAQUONNA LAW, ET AL.    v.
TERRY LIGON, ET AL.

TAQUONNA LA
January 7, 200

Page 289

[1] memory. Did you testify that you did or
[2] did not remember whether or not you had
[3] your lap belt on at the time of the
[4] accident?
[5]    A: I testified that I didn't
[6] remember.
[7]    Q: Okay. Khalil was asleep at
[8] the time of the accident?
[9]    A: Correct.
[10]    Q: Was Cornelius behaving
[11] himself?
[12]    A: I'm not sure if he was asleep
[13] as well. I'm not — he wasn't making any
[14] noise or anything.
[15]    Q: Nothing distracting you?
[16]    A: No.
[17]    Q: Okay. I need you to describe
[18] your body movements during the accident,
[19] which way your body moved from the point
[20] that Mr. Ligon's Blazer hit your Saturn
[21] until the Saturn came to rest.
[22]    A: I remember my chest hitting
[23] the steering wheel. That's about all I

Page 29

[1]    A: Don't remember. I don't
[2] remember.
[3]    Q: Okay. Do you remember either
[4] of your shoulders hitting anything during
[5] the accident?
[6]    A: My right arm had to hit
[7] something because I have a scratch in a
[8] U.
[9]    Q: Okay.
[10]    A: So I can't really say what it
[11] hit. I'm not sure.
[12]    Q: Did you document that scratch
[13] at any time, take any pictures of it,
[14] anything like that?
[15]    A: No.
[16]    Q: Is it still visible today?
[17]    A: Yes.
[18]    Q: Could you describe where on
[19] your arm and how long a scar it is?
[20]    A: It's here. There it is
[21] (indicating).
[22]    Q: It's your left arm?
[23]    A: My right arm.

Page 290

[1] remember is my chest hitting the steering
[2] wheel.
[3]    Q: Did that leave a bruise?
[4]    A: It didn't leave a bruise, but
[5] it left it sore.
[6]    Q: Was there any visible mark of
[7] the chest hitting the steering wheel?
[8]    A: None on the chest.
[9]    Q: Was there any visible mark on
[10] the steering wheel?
[11]    A: What do you mean, a mark on —
[12] like any — what do you mean?
[13]    Q: Did the steering wheel
[14] reflect — did you notice anything on the
[15] steering wheel that reflected the fact
[16] that your chest hit it?
[17]    A: No.
[18]    Q: Did your head come into
[19] contact with anything during the accident
[20] sequence?
[21]    A: No.
[22]    Q: You recall it did not or no,
[23] you don't remember?

Page 29

[1]    Q: Your right arm. I'm sorry.
[2] And it's up close to your shoulder?
[3]    A: Yes. Can you see it from —
[4]    Q: I can.
[5]    Q: Okay.
[6]    Q: Is that the only
[7] distinguishing mark you have after the
[8] accident?
[9]    A: Yes.
[10]    Q: Do you recall any other body
[11] movements that occurred to you during the
[12] accident?
[13]    A: No.
[14]    Q: Are you aware of any of the
[15] other passengers in the car and their
[16] body movements during the accident?
[17]    A: Lawanda went forward, I think.
[18] Khalil went forward. I'm not sure about
[19] Jonathan and Cornelius.
[20]    Q: Are you aware of anything that
[21] Lawanda came in contact with on the
[22] inside of the vehicle?
[23]    A: It was either the windshield

Page 289

[1] memory. Did you testify that you did or
[2] did not remember whether or not you had
[3] your lap belt on at the time of the
[4] accident?
[5]   **A:** I testified that I didn't
[6] remember.
[7]   **Q:** Okay. Khalil was asleep at
[8] the time of the accident?
[9]   **A:** Correct.
[10]   **Q:** Was Cornelius behaving
[11] himself?
[12]   **A:** I'm not sure if he was asleep
[13] as well. I'm not -- he wasn't making any
[14] noise or anything.
[15]   **Q:** Nothing distracting you?
[16]   **A:** No.
[17]   **Q:** Okay. I need you to describe
[18] your body movements during the accident,
[19] which way your body moved from the point
[20] that Mr. Ligon's Blazer hit your Saturn
[21] until the Saturn came to rest.
[22]   **A:** I remember my chest hitting
[23] the steering wheel. That's about all I

Page 29

[1]   **A:** Don't remember. I don't
[2] remember.
[3]   **Q:** Okay. Do you remember either
[4] of your shoulders hitting anything during
[5] the accident?
[6]   **A:** My right arm had to hit
[7] something because I have a scratch in a
[8] U.
[9]   **Q:** Okay.
[10]   **A:** So I can't really say what it
[11] hit. I'm not sure.
[12]   **Q:** Did you document that scratch
[13] at any time, take any pictures of it,
[14] anything like that?
[15]   **A:** No.
[16]   **Q:** Is it still visible today?
[17]   **A:** Yes.
[18]   **Q:** Could you describe where on
[19] your arm and how long a scar it is?
[20]   **A:** It's here. There it is
[21] (indicating).
[22]   **Q:** It's your left arm?
[23]   **A:** My right arm.

Page 290

[1] remember is my chest hitting the steering
[2] wheel.
[3]   **Q:** Did that leave a bruise?
[4]   **A:** It didn't leave a bruise, but
[5] it left it sore.
[6]   **Q:** Was there any visible mark of
[7] the chest hitting the steering wheel?
[8]   **A:** None on the chest.
[9]   **Q:** Was there any visible mark on
[10] the steering wheel?
[11]   **A:** What do you mean, a mark on —
[12] like any -- what do you mean?
[13]   **Q:** Did the steering wheel
[14] reflect — did you notice anything on the
[15] steering wheel that reflected the fact
[16] that your chest hit it?
[17]   **A:** No.
[18]   **Q:** Did your head come into
[19] contact with anything during the accident
[20] sequence?
[21]   **A:** No.
[22]   **Q:** You recall it did not or no,
[23] you don't remember?

Page 29

[1]   **Q:** Your right arm. I'm sorry.
[2] And it's up close to your shoulder?
[3]   **A:** Yes. Can you see it from --
[4]   **Q:** I can.
[5]   **A:** Okay.
[6]   **Q:** Is that the only
[7] distinguishing mark you have after the
[8] accident?
[9]   **A:** Yes.
[10]   **Q:** Do you recall any other body
[11] movements that occurred to you during the
[12] accident?
[13]   **A:** No.
[14]   **Q:** Are you aware of any of the
[15] other passengers in the car and their
[16] body movements during the accident?
[17]   **A:** Lawanda went forward, I think.
[18] Khalil went forward. I'm not sure about
[19] Jonathan and Cornelius.
[20]   **Q:** Are you aware of anything that
[21] Lawanda came in contact with on the
[22] inside of the vehicle?
[23]   **A:** It was either the windshield

# In The Matter Of:

*TAQUONNA LAW, ET AL.   v.*
*TERRY LIGON, ET AL.*

---

*JONATHAN LAW*
*January 7, 2003*

---

*TYLER, EATON, MORGAN, NICHOLS & PRITCHETT*
*COURT REPORTING*
*1975 SOUTHTRUST TOWER*
*420 NORTH TWENTIETH STREET*
*BIRMINGHAM, AL  35203*
*(205) 252-9152     FAX: (205) 252-0196*

*Original File LAWJ.V1, 117 Pages*
*Min-U-Script® File ID: 1560269073*

**Word Index included with this Min-U-Script®**

APPELLANT'S
EXHIBIT #8

[1] vehicle?

[2]    **A:** Taquonna.

[3]    **Q:** Just the two of you?

[4]    **A:** I'm not certain, but I know

[5] Taquonna went.

[6]    **Q:** How did you — where was the

[7] vehicle when you went to see it?

[8]    **A:** I don't know the name of the

[9] place, but it was in Phenix City.

[10]    **Q:** Like a junkyard?

[11]    **A:** Yes.

[12]    **Q:** Wrecker service?

[13]    **A:** Yeah.

[14]    **Q:** How did you get to the wrecker

[15] service?

[16]    **A:** We were in Leroy — Leroy went

[17] too. We was in his car.

[18]    **Q:** Did you notice Taquonna take

[19] anything out of the vehicle?

[20]    **A:** Her purse and Khalil's baby

[21] bag, and that's all I can recall.

[22]    **Q:** Did you notice Leroy take

[23] anything out of the car?

[1]    **A:** No.

[2]    **Q:** Did you take anything out of

[3] the car?

[4]    **A:** No.

[5]    **Q:** Is this the first time

[6] Taquonna had seen the car since the

[7] accident?

[8]    **A:** Not sure.

[9]    **Q:** Is this the first time Leroy

[10] had seen the car after the accident?

[11]    **A:** Yes.

[12]    **Q:** He was not at his mother's

[13] house when you were taking him there?

[14]    **A:** When I was taking who there?

[15]    **Q:** When you were taking Cornelius

[16] to his grandmother's house —

[17]    **A:** No.

[18]    **Q:** — to drop him off before the

[19] accident, Leroy was not at his mother's

[20] house?

[21]    **A:** No.

[22]    **Q:** Did either you or Leroy or

[23] Taquonna talk to anyone else while you

[1] were there visiting the car or viewing

[2] the car?

[3]    **A:** No, other than the lady that

[4] showed us, you know, the owner of the

[5] place and told us it was okay for us to

[6] go in and stuff.

[7]    **Q:** Did anything other than her

[8] giving you permission to go look at the

[9] car occur in that conversation?

[10]    **A:** No.

[11]    **Q:** Did she make any comment about

[12] the car?

[13]    **A:** No.

[14]    **Q:** Do you recall her name?

[15]    **A:** No.

[16]    **Q:** Do you recall what she looked

[17] like?

[18]    **A:** She was a short, white female.

[19]    **Q:** About how old?

[20]    **A:** Maybe late 30s, early 40s.

[21]    **Q:** What injuries did you receive

[22] because of this accident, Ms. Law?

[23]    **A:** I don't know all of them, but

[1] I can tell you the ones I know. My

[2] hands, my back and my neck, my fingers.

[3] The bone in my finger was like stiff sort

[4] of. And I was having really bad

[5] headaches, so I had to have surgery.

[6]    **Q:** What else?

[7]    **A:** That's about it.

[8]    **Q:** Tell me about your back

[9] problems.

[10]    **A:** It simply hurt it when I'd

[11] maybe bend. It was more like in my

[12] bones, you know. It was like my whole

[13] back was aching.

[14]    **Q:** Do you still have problems

[15] with that today?

[16]    **A:** No.

[17]    **Q:** About how long did you notice

[18] having the back problems?

[19]    **A:** From that time up until I went

[20] back to work.

[21]    **Q:** When would that have been?

[22]    **A:** I went back to work in, I

[23] think it was July 12th.

Page 65

[1] **Q:** And by the time you went back
[2] to work, you were no longer having back
[3] problems, correct?
[4] **A:** Correct.
[5] **Q:** What treatment did you receive
[6] for your back?
[7] **A:** I want to say muscle relaxer
[8] but I'm not sure. But it was medication,
[9] pain relief or something that they
[10] prescribed.
[11] **Q:** Who prescribed?
[12] **A:** Okay. For my back. I was
[13] going to St. Francis. I don't know the
[14] doctor's name.
[15] **Q:** Is St. Francis a hospital?
[16] **A:** Hospital.
[17] **Q:** Were you being seen in the
[18] emergency room there?
[19] **A:** No. It was just like doing my
[20] X-rays and all that.
[21] **Q:** But this is after you had been
[22] released from Columbus Medical Center?
[23] **A:** Correct.

Page 86

[1] **Q:** About how long after you were
[2] released from Columbus Medical Center did
[3] you receive treatment at St. Francis?
[4] **A:** Following it. After I left
[5] the medical center, they sent me to
[6] someone else to treat me.
[7] **Q:** And about how long after you
[8] were discharged from Columbus Medical
[9] Center were you first seen at St.
[10] Francis?
[11] **A:** I'm not sure.
[12] **Q:** Was it a week?
[13] **A:** Probably.
[14] **Q:** About a week?
[15] **A:** About a week.
[16] **Q:** But you don't remember who the
[17] doctor was?
[18] **A:** No. I don't remember his
[19] name.
[20] **Q:** Do you remember the name of
[21] the practice group?
[22] **A:** No.
[23] **Q:** How many times did you see

Page 87

[1] anyone at St. Francis about your back?
[2] **A:** St. Francis then sent me to
[3] another part of — I don't know how many
[4] times I've went. They sent me to
[5] another — I think it was a bone doctor
[6] or a bone and neck doctor, bone and
[7] something doctor. And they sent me to
[8] him, and he was in another building by
[9] St. Francis. But I don't know — I don't
[10] know his name either.
[11] **Q:** When you went to St. Francis
[12] and you said they referred you to a bone
[13] doctor, you did not go to the St. Francis
[14] emergency room?
[15] **A:** No. I never went to St.
[16] Francis' emergency room.
[17] **Q:** But they referred you to a
[18] bone doctor. Do you recall the bone
[19] doctor's name?
[20] **A:** No.
[21] **Q:** How many times did you see the
[22] bone doctor?
[23] **A:** About four times. Then he

Page 88

[1] sent me somewhere else.
[2] **Q:** What did they do for you?
[3] **A:** That is when I was having the
[4] headaches, so he sent me to a nose and —
[5] **Q:** Was it an ear, nose, and
[6] throat doctor?
[7] **A:** Ear, nose, and throat doctor.
[8] **Q:** Do you recall the ear, nose,
[9] and throat doctor's name?
[10] **A:** Dr. Phelps, P-h-e-l-p-s.
[11] **Q:** Do you recall Dr. Phelps'
[12] first name?
[13] **A:** No.
[14] **Q:** Do you recall where Dr.
[15] Phelps' office is?
[16] **A:** It's off of Warm Springs Road.
[17] **Q:** Did you receive any other
[18] treatment for your back other than what
[19] we've talked about?
[20] **A:** No.
[21] **Q:** What about your neck, is there
[22] any treatment?
[23] **A:** I just had a brace. They gave

In The Circuit Court of Russell County,
State of Alabama

Terry Ligon,
        Petitioner,

    - vs -

State of Alabama,
        Respondent,

Case Nos.    CC-01-352.60
        thru   CC-01-356.60

## Motion For Appointment of Counsel

Comes now the Petitioner, Terry Ligon, pro-se, in the above styled cause and respectfully moves this Honorable Court to appoint counsel to assist him and represent him in his A.R.Cr.Pro., Rule 32 petition for post-conviction relief and as good cause states the following:

Petitioner avers that because of the seriousness of the cases involved and that he is not well educated, nor able to comprehend the judicial process, its terms, and requirements he needs assistance, wherefore, he moves this Honorable Court to appoint counsel to assist him and grant his Affidavit of Hardship, pending before this Honorable Court as filed on October 31, 2002, and then again on March 2, 2003.

Respectfully submitted, on the

_____
TERRY LIGON # 250217

the 5th day of November, 2003.